**13 CIV 6759**

MARK SCHERZER, ESQ. (MS-2622)
Attorney for Plaintiff
7 Dey Street, Suite 600
New York, New York 10007
Tel: (212) 406-9606

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
PAMELA WALLACE,                                    :

             Plaintiff,               :          ___ CIV _____ (_____)

    -against-                                       :

GROUP LONG TERM DISABILITY PLAN FOR :
EMPLOYEES OF TDAMERITRADE HOLDING
CORPORATION and                                    :
THE HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,                                 :

             Defendants.              :          **COMPLAINT**
-------------------------------------------------------------X

       Plaintiff, Pamela Wallace, by her attorney, Mark Scherzer, Esq., for her Complaint,

respectfully alleges:

## Type of Action

       1.     This is an action brought under the Employee Retirement Income Security Act of

1974 ("ERISA"), as amended, to contest a denial of benefits by defendant the Group Long Term

Disability Plan for Employees of TDAmeritrade Holding Corporation (the "Plan"), insured by

The Hartford Life and Accident Insurance Company ("The Hartford").

## Parties

2.      Plaintiff, Pamela Wallace is a citizen of the State of Connecticut, currently residing in Fairfield County, Connecticut.

3.      Upon information and belief, the Plan was established and maintained by TDAmeritrade Holding Corporation ("TD Ameritrade"), a brokerage firm which has its principal place of business at 4211 South 102nd St., Omaha, Nebraska.  TD Ameritrade maintains offices throughout the United States, including in New York.

4.      Upon information and belief, the Hartford is a corporation with its principal place of business at 200 Hopmeadow Street, Simsbury, Connecticut, and is engaged in the business of issuing, *inter alia*, policies of group long term disability insurance.

## Jurisdiction and Venue

5.      Upon information and belief, the Plan is an "employee welfare benefit plan" or a "welfare plan" subject to ERISA, including its civil enforcement provisions.  ERISA §§ 3(1), 3(3), 4(a), 502(a)(1)(B), and (a)(3), 29 U.S.C. §§ 1002(1), (3), 1003(a), 1132(a)(1)(B), and (a)(3).

6.      The court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, and pursuant to §§ 502(a)(1)(B) and (a)(3) of ERISA 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), (e)(1), and

(g).

7.      Venue is appropriate in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the defendant Plan may be found in this district.

### FIRST CAUSE OF ACTION:
### IMPROPER TERMINATION OF MS. WALLACE'S DISABILITY BENEFITS

8.      Coverage under the Plan was provided to Ms. Wallace as an employee of TD Ameritrade.

9.      Upon information and belief, Ms. Wallace, at all relevant times, was and is covered as a Class 1 Full Time Active Non-Commissioned Associate of TD Ameritrade.  She became a full time employee of TD Ameritrade in 2009 when TD Ameritrade acquired her then employer in New York, Investools.  Since she became a participant in the Plan, Ms. Wallace has at all times complied with all relevant terms and obligations of the Plan.

10.     Upon information and belief, the Plan's coverage is provided through a group insurance policy, Group Long Term Disability Income Policy No. GLT-675997 (the "Policy").

11.     Upon information and belief, the Policy was issued in 2007 by the Hartford.

12.     Upon information and belief, TD Ameritrade is designated as the Plan's Sponsor and Plan Administrator.

3

13.     Upon information and belief, the Hartford is designated as the Plan's claim fiduciary for benefits provided under the Policy.

14.     Ms. Wallace was employed by TD Ameritrade from the date of its acquisition of Investools in 2009 until she became disabled on or about February 4, 2010.

15.     As of February 3, 2010, Ms. Wallace was employed as a Group Marketing Manager.

16.     Ms. Wallace suffered from progressive fatigue, chronic pain and sleep disorder attributable to fibromyalgia and undifferentiated connective tissue disease, as well as intensifying symptoms of obsessive compulsive disorder, followed by a foot fracture in 2009 which in the aggregate prevented her from working after February 3, 2010.

17.     Disability benefits for Class 1 participants are payable for 24 months under the terms of the Plan after a 180-day elimination period if she is "prevented from performing one or more of the Essential Duties of [her] occupation." After 24 months, such benefits are payable if she is "prevented from performing one or more of the Essential Duties of: ... Any Occupation," where "Any Occupation means any occupation for which [she] is qualified by education, training or experience, and that has an earnings potential greater than the lesser of: 1) the product of [her] Indexed Pre-Disability Earnings and the Benefit Percentage; or 2) the Maximum Monthly Benefit."

4

18.     As a Class 1 participant, Ms. Wallace qualified for disability benefits equal to

60% of "Pre-disability Earnings," meaning the regular monthly rate of pay in effect on the last

day actively at work before becoming disabled, up to a specified "Maximum Monthly Benefit"

of $12,000.

19.     Ms. Wallace's monthly "Pre-Disability Earnings," under the terms of the Plan,

were $14,166.69 a month, which qualified her for a monthly disability benefit of $8,500.01.

20.     The Plan provides that "Indexed Pre-Disability Earnings" means "your Pre-

Disability Earnings adjusted annually by adding the lesser of 1) 10%; or 2) the percentage

change in the Consumer Price Index (CPI-W)" where "the percentage change in the CPI-W

means the difference between the current year's CPI-W as of July 31, and the prior year's CPI-W

as of July 31, divided by the prior year's CPI-W" and where "the adjustment is made January 1st

each year after You have been Disabled for 12 consecutive months...."

21.     The Plan provides that disability benefits for Class 1 participants are payable

through Normal Retirement Age (or 42 months, if greater) for any disability which starts before

age 63.

22.     As of February 4, 2010, Ms. Wallace was 50 years old.

23.     Ms. Wallace timely submitted initial notice and initial proof of claim under the

Plan for disability benefits, based on a disability onset date of February 4, 2010.

24.     The Hartford determined that Ms. Wallace was disabled under the terms of the Plan, from performing one or more of the essential duties of her own occupation for the first 24 months of benefits.  The Hartford approved the claim based on her foot fracture, and paid her disability benefits continuously for the period from August 5, 2010 (after the end of the 180-day elimination period), through August 4, 2012.

25.     Upon information and belief, in the summer of 2011, The Hartford assigned Ms. Wallace's claim to a special investigations unit and caused her to be the subject of surveillance, but after such surveillance continued to pay her long term disability benefits.

26.     Upon information and belief, in 2012 The Hartford began evaluating whether Ms. Wallace would qualify for disability under the "any occupation" definition which applied after 24 months of benefits had been received.

27.     Upon information and belief, Ms. Wallace, as of January 1, 2012, was entitled to an Indexed Pre-Disability Earnings adjustment, for purposes of the "any occupation" definition, as a result of which Hartford calculated the product of her Indexed Pre-Disability Earnings and her benefit percentage to be $8,848.51 per month.

28.     In connection with that evaluation, at The Hartford's request, Ms. Wallace underwent an independent medical examination ("IME") by a rheumatologist on April 18, 2012.

6

The IME confirmed her diagnosis of fibromyalgia, but the examiner found her not to be disabled from working.

29.     By letter, dated July 19, 2012, The Hartford rendered an adverse benefit determination, terminating Ms. Wallace's disability benefits under the Plan.

30.     In an appeal dated February 22, 2013 (pursuant to an extended appeal deadline granted by The Hartford), Ms. Wallace appealed The Hartford's termination of her disability benefits.

31.     By letter dated March 29, 2013, The Hartford issued its benefit determination on review, denying Ms. Wallace's appeal and refusing to reinstate her disability benefits.

32.     Ms. Wallace has exhausted the Plan's internal appeal procedures with regard to her disability benefits.

33.     At all relevant times, Ms. Wallace has remained disabled under the terms of the Plan.

34.     Upon information and belief, The Hartford's termination of disability benefits August 5, 2012, was erroneous, against the weight of the evidence, in violation of the terms of the Plan, and arbitrary and capricious, because, *inter alia*:

        a.   The termination was premised on Ms. Wallace's ability to establish a spa business

while disabled, but ignored that Ms. Wallace was unable to operate the spa business for the same reasons that prevented her from working, and that she lost her spa franchise as a result of that inability to attend work and manage the business.

b. The Hartford and its IME relied heavily on video surveillance of Ms. Wallace in 2011, and associated with attending the IME examination mandated by Hartford in 2012, without understanding that the activities Hartford used to determine her capacity for vigorous activity were largely attributable to her OCD, and without taking into account the lack of observed outside activity when surveillance was undertaken in 2012, shortly before the termination of the claim.

c. The Hartford relied on the sedentary aspects of the jobs it identified as appropriate for Ms. Wallace to find her able to engage an occupation for which she was suited by education, training and experience, without accounting for her inability, as a result of pain, fatigue and behavior associated with her OCD, to satisfy the work requirements for those occupations.

d. The Hartford gave no weight to Ms. Wallace's subjective complaints of pain and fatigue despite confirmation by its own IME of her fibromyalgia diagnosis and despite the known side effects of the drugs prescribed for Ms. Wallace.

e. The Hartford failed to undertake any psychiatric evaluation of Ms. Wallace.

f. The Hartford looked at each of Ms. Wallace's conditions in isolation, without taking into account the cumulative and mutually exacerbating effect of all her conditions.

g. The Hartford provided selective information to the IME doctor, sought opinions

8

that did not correspond to the terms of the policy, and interpreted the IME's

opinion in a way biased towards Hartford's interest in not paying Ms. Wallace's

claim.

h. After receiving the initial report of the IME, which determined that while Ms.

Wallace could work an 8 hour day, she would be limited by severe fatigue and

would need frequent breaks, The Hartford improperly sought to influence and

change that opinion by supplying the IME examiner with cherry-picked

surveillance evidence and requesting a revised report.

i. The Employability Analysis conducted by The Hartford in June, 2012, which

concluded that she was capable of working at alternative occupations, assumed no

significant restrictions or limitations on Ms. Wallace's ability to work because the

analysis relied solely on the report of its IME doctor (whose only significant

restriction was that Ms. Wallace be afforded "frequent breaks ... at a frequency of

approximately hourly" throughout an 8-hour sedentary work day), and did not

incorporate the restrictions and limitations identified by Ms. Wallace's treating

physicians.

35.     As a result of The Hartford's improper termination of benefits, Ms. Wallace has

been damaged in the amount of $59,500.07, comprised of unpaid disability benefits under the

Plan during the period between its improper termination of benefits on August 5, 2012, and

March 29, 2013, when it decided to uphold that termination.

**SECOND CAUSE OF ACTION:**
**IMPROPER REFUSAL, ON REVIEW,**
**TO REINSTATE MS. WALLACE'S DISABILITY BENEFITS**

36.   Plaintiff repeats and realleges paragraphs 1 through 33, above, as if set forth fully herein.

37.   The Hartford's decision to uphold the termination of benefits, as contained in its letter dated March 29, 2013, was erroneous, against the weight of the evidence, in violation of the terms of the Plan, arbitrary and capricious, in that, it reaffirmed and adhered to the errors of the first decision and in addition, *inter alia*:

    a.   The Hartford relied principally on the opinion of a consulting psychiatrist who did not perform an in-person medical examination of Ms. Wallace; who was not provided with witness statements and other information from Ms. Wallace's appeal that would have contradicted the consulting psychiatrist's assumptions; and who performed an analysis of tapes of observed activity in 2011 but ignored the inactivity in observations of 2012 in arriving at his conclusions

    b.   The Hartford relied on a report by a consulting rheumatologist who also did not examine Ms. Wallace and who arbitrarily rejected the report of Ms. Wallace's treating physician as to laboratory results based on a shift in medical record keeping which made the earlier laboratory findings unavailable. The consulting rheumatologist further relied on an analysis of Ms. Wallace's surveilled activity from videotapes without addressing her non-activity on dates closest to the date as of which the benefits were terminated.

    c.   The Hartford relied on the same Employability Analysis it performed in June, 2012, which continued to suffer from the same problem (it took no account of the restrictions and limitations reported by Ms. Wallace and her treating physicians).

10

38.    As a result of The Hartford's improper failure to reinstate Ms. Wallace's benefits upon receipt of her request for review, Ms. Wallace has been damaged in the amount of $110,500.13, comprised of unpaid disability benefits under the Plan during the period between its improper termination of benefits as of August 4, 2012, through September 5, 2013, plus $8,500.01 for each month after September 5, 2013, until the date of judgment.

**WHEREFORE**, plaintiff demands judgment:

On her first cause of action against the Plan and The Hartford, awarding her not less than $59,500.07, with pre-judgment interest from the accrual date of each benefit payment;

On her second cause of action against the Plan and The Hartford, awarding her not less than $110,500.13, plus $8500.01 for each month after September 5, 2013, until the date of judgment, with pre-judgment interest from the accrual date of each benefit payment;

Together with interest, reasonable attorneys' fees and costs of this action, and such other, further and different relief as to the Court seems just, proper, and equitable.

Dated:        New York, New York
              September 20, 2013

                                          _____
                                          MARK SCHERZER, ESQ. (MS-2622)
                                          Attorney for Plaintiff
                                          7 Dey Street, Suite 600
                                          New York, New York 10007
                                          Tel: (212) 406-9606

11