UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                 :
PAMELA WALLACE,                     :
                  Plaintiff,      :
                                   :
        -against-             :
                                     :
GROUP LONG TERM DISABILITY PLAN FOR :
EMPLOYEES OF TDAMERITRADE HOLDING :
CORPORATION, et al.,                 :
                    Defendants.   :
------------------------------------------------------------ X

13 Civ. 6759 (LGS)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3/26/15___

LORNA G. SCHOFIELD, District Judge:

       Plaintiff Pamela Wallace brings this action under § 1132 of the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., alleging that she was wrongfully

denied disability benefits by Defendant The Hartford Life and Accident Insurance Company

("Hartford") under the terms of a long-term disability plan funded by her former employer,

TDAmeritrade Holding Corporation ("TDAmeritrade").  Defendants have filed a counterclaim to

recover any overpayment arising out of a retroactive award of benefits to Plaintiff by the

Commissioner of Social Security.  All parties now move for summary judgment.  For the reasons

that follow, Plaintiff's motion for summary judgment is granted in part, and Defendants' motion

for summary judgment is granted in part.

## I.     BACKGROUND

       The facts below are taken from the parties' extensive statement of undisputed facts

pursuant to Local Rule 56.1 and the exhibits submitted in connection with these motions.  Unless

otherwise noted, the facts are undisputed.

       Plaintiff was a Senior Group Marketing Manager at TDAmeritrade, earning over $14,000

per month, when she stopped working in February 2010 at the age of 50.  Plaintiff was a

participant in the Group Long Term Disability Plan for Employees of TDAmeritrade Holding

Corporation (the "Plan"), an employee welfare benefit plan regulated under ERISA.  The Plan was insured by Hartford, and Hartford administered all claims for benefits under the Plan.

### A.  The Plan

The Plan provides three possible periods of disability benefits, depending on eligibility: (1) disability benefits for an "Elimination Period" of six months, which, in accordance with the parties' motion papers, are referred to as short-term disability ("STD") benefits in this Opinion; (2) long-term disability ("LTD") benefits for twenty four months after the expiration of the STD benefits for employees who are unable to perform one or more of the essential duties of their own occupation; and (3) LTD benefits thereafter for employees whose disability prevents them from performing one or more of the essential duties of "[a]ny occupation."  The phrase "any occupation" is defined in the Plan as an occupation for which the participant is "qualified by education, training, or experience" that meets an established earnings threshold.

The Plan grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret" the terms of the Plan.

### B.  Plaintiff's Claim for STD Benefits

Plaintiff filed a claim for STD benefits on March 5, 2010, asserting that she was disabled by symptoms related to a nonunion fracture in her left foot, plantar fasciitis in her right foot, fibromyalgia, undifferentiated connective tissue disorder ("UCTD") and obsessive compulsive disorder ("OCD").  In her telephone interview with Hartford that day, she listed her physicians as Dr. Theodore Antonetz, a podiatrist, and Dr. Laura Sherman, a psychiatrist, and provided their phone numbers.  Plaintiff described her position at TDAmeritrade as a "sedentary position

mostly," at which she worked 40 to 45 hours per week.  Hartford categorized Plaintiff's occupation as "light" duty.

In making its determination as to Plaintiff's STD benefits, Hartford reviewed Attending Physician's Statements of Functionality and Continued Disability ("APS") from Dr. Antonetz dated March 19, 2010, April 16, 2010, and May 14, 2010, that placed limitations and restrictions on Plaintiff's ability to sit, stand and walk because of her nonunion foot fracture, which was not "healing well."

On June 14, 2010, Hartford advised Plaintiff that her application for STD benefits was approved until its expiration on August 4, 2010.

### C.  Plaintiff's Initial Claim for LTD Benefits

Plaintiff's file was referred to Hartford's LTD Claims Unit on June 11, 2010.  On June 14, 2010, Hartford sent Plaintiff an LTD application.  Hartford received Plaintiff's application on July 1, 2010.

Hartford also received medical information from Plaintiff's treating physicians.  On June 10, 2010, Dr. Antonetz sent Hartford another APS, which diagnosed Plaintiff with delayed nonunion fracture in the left foot, plantar fasciitis in the right foot and fibromyalgia.  He also noted that Plaintiff reported pain while walking and standing.  He stated that, although Plaintiff's fracture was healing, she could not return to work, with or without accommodations.  Further, Dr. Antonetz limited Plaintiff to walking or standing for no more than fifteen minutes at a time and to lifting a maximum of ten pounds.

On June 16, 2010, a Hartford Claim Examiner, Stephanie Wojcik, contacted Plaintiff by telephone to conduct a claimant interview.  In addition to reporting the symptoms recognized by Dr. Antonetz, Plaintiff also stated that she had been diagnosed with OCD.

Approximately a month later, on July 13, 2010, Hartford received an updated APS from Dr. Antonetz dated July 7, 2010.  Dr. Antonetz stated that upon physical examination, Plaintiff complained of pain and palpitation in both feet.  He stated that Plaintiff could sit for twenty four hours at a time, and stand or walk for up to fifteen minutes at a time for a maximum of one hour per day.  He did not identify any limitations on Plaintiff's ability to bend, lift reach, finger, handle, crouch, kneel, or drive, nor did he respond to the question of whether Plaintiff had any cognitive or psychiatric impairment.  In addition to Dr. Antonetz's updated APS, Hartford also received Dr. Antonetz's office visit notes spanning Plaintiff's visits from March 25, 2010, to July 2, 2010, which reiterated his diagnoses.  The office visit notes also referenced X-rays of Plaintiff's left foot which showed bone calluses and new bone formations.  The notes also showed that Plaintiff consistently reported pain in her left foot.

On July 21, 2010, Hartford received and reviewed an APS from Plaintiff's rheumatologist, Dr. Steven Meed, dated July 16, 2010 (the "2010 Meed APS").  Dr. Meed listed his primary diagnosis as fibromyalgia and his secondary diagnosis as UCTD.  According to Dr. Meed, Plaintiff reported subjective symptoms of severe fatigue, muscle aches and sleep disturbance.  Upon physical examination, Dr. Meed found diffuse positive trigger points.  Dr. Meed stated that Plaintiff could not sit, stand or walk for any number of consecutive hours in a general workplace environment, nor could she lift any weight.

4

On July 21, 2010, Wojcik sent a letter to Dr. Meed seeking clarification about his July 2010 APS because Plaintiff's physical limitations were unclear.  In particular, the letter asked Dr. Meed to indicate his agreement or disagreement regarding various statements about Plaintiff's work capacity.  Less than two weeks later, on August 2, 2010, Hartford received and reviewed Dr. Meed's response in which he checked two boxes indicating that Plaintiff could not work at a full-time sedentary or light physical demand job.  The next day, on August 3, 2010, Wojcik referred Plaintiff's medical records for review by a Hartford Medical Case Manager, Nurse Debbie Smith.

Following her review, Nurse Smith stated that according to Dr. Antonetz's records -- in particular his updated APS dated July 7, 2010 -- Plaintiff had the functional capacity to sit for twenty four hours at a time, and stand or walk for up to fifteen minutes at a time for a maximum of one hour per day.  She also found that Dr. Meed's records "conflict[ed] with recently received information" and required clarification, including his office visit notes.

On August 5, 2010, Hartford received and reviewed Dr. Meed's office records.  In his office visit note dated March 2, 2010, approximately a month after Plaintiff had stopped working, Dr. Meed noted that he found no joint or tendon abnormalities, muscle weakness, proximal muscle weakness or tender points.  He noted that there was no further evidence of connective tissue disorder, and diagnosed Plaintiff with fibromyalgia.

In his office visit note dated June 3, 2010, Dr. Meed concluded that there was no further evidence of connective tissue disorder and stated, "fibromyalgia is the major limiting factor."  He also reported that Plaintiff complained of symptoms related to fibromyalgia, including difficulty sleeping.  Upon physical examination, Dr. Meed did not find tender points or muscle weakness.

5

In his office visit note dated July 19, 2010, Dr. Meed found that Plaintiff suffered from "a combination of fibromyalgia and sleep disturbance and possibly a poorly defined connective tissue disorder." Dr. Meed concluded that there was no further evidence of connective tissue disorder and that fatigue and fibromyalgia were Plaintiff's major limiting factors. He noted diffuse mild tender points, but no other joint or muscle weakness. Dr. Meed stated that Plaintiff's level of fatigue and her difficulty concentrating were both "profound."

Nurse Smith found that Dr. Meed's office notes provided "very little" support for his view that Plaintiff was capable of "absolutely no function," and sought to refer Plaintiff's records for review by an independent medical record peer review consultant ("IPC"). Dr. Ara H. Drakanian, a board-certified rheumatologist, was retained as an IPC to review Plaintiff's records and issue a report as to her functionality.

In his report dated September 8, 2010, Dr. Drakanian's summary of Plaintiff's medical records stated that Plaintiff had an "uncharacterized connective tissue disease" and that she had a metatarsal stress fracture in her left foot and plantar fasciitis in her right foot. Dr. Drakanian found that the highest level of functional capacity Plaintiff could reasonably be expected to perform was forty hours per week, on the condition that she was not required to sit continuously for more than eight hours, or stand for more than fifteen minutes at a time and for no more than a total of one hour per day. He also noted that Plaintiff could be expected to lift or carry occasionally weights of up to ten pounds. He stated that Plaintiff's medical records showed that her UCTD had resolved and her fibromyalgia was not sufficiently characterized. In any case, Dr. Drakanian concluded that Plaintiff's UCTD and fibromyalgia were not impairing and accordingly warranted no work-related restrictions or limitations. Dr. Drakanian also reported that Dr. Meed

6

did not return his call to discuss Plaintiff's functional capacity.  After reviewing the report,

Hartford sent it to Dr. Meed for his comments.  Dr. Meed did not respond.

Nurse Smith then reviewed another updated APS from Dr. Antonetz dated September 16,

2010, which stated that Plaintiff was functionally able to sit for twenty four hours per day, but

could not stand, walk, lift or carry at all.  On September 21, 2010, Nurse Smith called Dr.

Antonetz for further clarification.  During the conversation, Dr. Antonetz informed Nurse Smith

that Plaintiff had been referred to Dr. Christopher Hubbard, an orthopedic surgeon, for surgery on

her left foot, scheduled for November 8, 2010.  Dr. Antonetz also stated that due to the nonunion

fracture in her left foot, Plaintiff could not bear any weight on that foot without risking further

damage.  Nurse Smith found that Dr. Antonetz's conclusion was medically supported and

recommended getting Plaintiff's office visit notes six weeks after the scheduled surgery.

Following this recommendation, Hartford approved Plaintiff for LTD benefits by letter dated

September 22, 2010, based on Plaintiff's nonunion fracture of her foot.

### D.  Plaintiff's Claim for Continuing LTD Benefits

#### 1.  *Initial Review*

On November 24, 2010, Wojcik telephoned Plaintiff for a milestone interview.  Plaintiff

stated that she had undergone surgery on her left foot and that subsequent X-rays "looked good,"

but that she would not be able to return to work for "a while."

Approximately two weeks later, on December 8, 2010, Plaintiff faxed a letter to Hartford

explaining her then-current medical conditions.  First, she stated that her right foot was

developing the same problems that had been surgically corrected in her left foot and likely would

also require surgery.  Second, she reported suffering from UCTD which caused "severe pain" in

7

her joints and muscles.  Third, she stated that she suffered from OCD, which "manifest[ed] itself in . . . not being able to leave the house," in "having difficulty traveling as required by [her] job, and not being able to shake hands, as required in business."  In response, Wojcik stated that she would request updated medical records from Dr. Hubbard regarding Plaintiff's foot injuries and medical records from Plaintiff in support of her symptoms related to OCD.

On December 17, 2010, Hartford received and reviewed Dr. Hubbard's APS dated December 14, 2010, in which he stated that because of her feet, Plaintiff was unable to stand or walk at all, but was able to sit for four hours at a time for a total of eight hours per day.  Dr. Hubbard also noted that Plaintiff could not lift or reach with either arm, nor could she bend, kneel, crouch or drive.  He expected Plaintiff's limitations to last through March 2011.

On January 19, 2011, Hartford received an updated APS from Dr. Meed dated January 11, 2011.  Dr. Meed now listed UCTD, fibromyalgia and fatigue syndrome as Plaintiff's primary diagnoses, and nonunion fracture in her left foot as her secondary diagnosis.  He stated, like Dr. Hubbard, that Plaintiff was unable to stand or walk at all, but that she was able to sit for three to four hours at a time.  He also noted Plaintiff's OCD and difficulty concentrating as a result of her psychiatric or cognitive impairments.

On February 4, 2011, Wojcik again referred Plaintiff's medical records to Hartford Medical Case Manager, Nurse Smith, to determine Plaintiff's level of functionality at the time. Four days later, on February 8, 2011, Nurse Smith received and reviewed Dr. Hubbard's medical records.  In his notes dated December 14, 2010, Dr. Hubbard stated that, following Plaintiff's surgery on her left foot, he had fitted Plaintiff for an orthopedic boot and told her that she could begin bearing weight with the boot.  A few weeks later, on January 4, 2011, Dr. Hubbard noted

that Plaintiff had reported that she now experienced minimal soreness and was in a better

condition than before the surgery.

In a subsequent APS dated February 16, 2011, Dr. Hubbard informed Hartford that

Plaintiff was scheduled for another surgery, this time for her right foot, on February 28, 2011.

On February 8, 2011, the same day that she reviewed Dr. Hubbard's medical records,

Nurse Smith also received and reviewed Dr. Meed's official visit notes for Plaintiff dated January

11, 2011.  Dr. Meed's notes stated that Plaintiff's fibromyalgia had not improved significantly,

but that she was no longer experiencing weakness in her muscles.  He found that Plaintiff's

fatigue associated with fibromyalgia was her major limiting factor and that she had limited

evidence to support a diagnosis of UCTD.

On February 22, 2011, Wojcik received and reviewed an APS dated February 4, 2011,

from Dr. Laura Sherman, Plaintiff's treating psychiatrist.  Dr. Sherman diagnosed Plaintiff with

OCD.  Dr. Sherman stated that "it takes an hour for [Plaintiff] to shower.  [Plaintiff h]as to

excessively clean apartment before leaving.  She constantly washes hands and can't travel due to

excessive cleaning of room."  Dr. Sherman found that Plaintiff had an "anxious and depressed

mood and affect" and had "[d]ifficulty coping with symptoms."  She explained that stress

exacerbates Plaintiff's OCD, and that following her foot injury and its attendant stress, starting in

December 2010, Plaintiff's "[c]ontamination fears and rituals became disabling."  According to

Dr. Sherman, Plaintiff's target return to work date was February 4, 2012 -- one year from the date

of the APS.

Three months later, on May 9, 2011, Hartford Claim Examiner Signia Alagna received

and reviewed an office visit note from Dr. Hubbard dated April 5, 2011.  At the visit, Plaintiff

reported minimal swelling, and Dr. Hubbard scheduled her for six weeks of physical therapy as part of a "slow return to normal routine."  Alagna planned to reassess Plaintiff's condition on or about May 20, 2011, after her next office visit with Dr. Hubbard and the completion of her physical therapy.

Alagna conducted a milestone telephone call with Plaintiff on May 26, 2011.  Plaintiff reported several health issues, including her foot condition, which caused her constant pain; UCTD, which prevented her from waking up in the morning; and OCD, which made leaving the house a time consuming affair and made her wary of shaking hands because of her phobia of germs.  During the call, Plaintiff informed Alagna that she would soon be changing her treating doctors because she planned to move from New York to Connecticut in the near future.

Five days after the call, on May 31, 2011, Alagna received and reviewed Plaintiff's latest office visit notes from Dr. Hubbard dated May 18, 2011.  Physical examination revealed minimal swelling and tenderness at the plantar heel of the right foot, which had caused Plaintiff pain for over a year.  He recommended continuing home exercise, but discontinuing physical therapy, which appeared to have aggravated Plaintiff's toe, and scheduled a follow-up appointment two months later.

Based on her review of Plaintiff's medical records, particularly Dr. Sherman's report, Alagna noted that OCD might become Plaintiff's "primary condition."

On June 22, 2011, Hartford Claim Examiner Daniel Zittlow received and reviewed an undated Physical Capacity Evaluation completed by Dr. Hubbard between June 16 and June 22, 2014.  Dr. Hubbard stated that Plaintiff was now restricted to sitting for eight hours per day and standing or walking for one hour per day.  Plaintiff could frequently reach at waist level and lift

10

up to 20 pounds.  She could also drive occasionally.  She was, however, completely restricted from lifting more than twenty pounds, climbing, balancing, stooping, kneeling, crouching, crawling, and reaching above her shoulder.

On July 26, 2011, Plaintiff's medical records were referred to Hartford Medical Case Manager, Nurse Smith, for a third time.  On that day, Nurse Smith called Plaintiff and found that her phone had been disconnected.  Two days later, on July 28, 2011, Plaintiff called to inform Hartford of her new address and phone number in Connecticut.

On August 11, 2011, Alagna called Plaintiff.  Plaintiff informed Alagna that she could not talk because she was driving, but that she would expect a call from Hartford the next day, August 12, 2011.

Alagna called Plaintiff four days later on August 15, 2011, and reached voicemail.  Later that day, Plaintiff returned Alagna's call.  Plaintiff reported that her primary condition was UCTD, which caused her to sleep up to fourteen hours per day.  Plaintiff also continued to experience foot pain.  Plaintiff stated that she had not started seeing a new rheumatologist in Connecticut because she wanted to be referred by Dr. Meed.  Plaintiff reported that her biggest issue at the time was fatigue and pain, that she could not travel and that her OCD was "problematic in the work[] environment."  She also stated that she did not plan to see Dr. Sherman soon, and that her last office visit had been in April 2011.

Following the conversation, Alagna noted that Hartford had initially approved Plaintiff's claim for LTD benefits based on the restrictions and limitations related to her foot surgery, and that Plaintiff's claimed conditions of UCTD and OCD had not been found to be disabling for her occupation.

Alagna recommended referring Plaintiff's claim to the Hartford Claims Investigative Unit ("CIU") because (1) "it ha[d] been hard to reach [Plaintiff] on several occasions" even though Plaintiff claimed she barely left home and that her OCD restricted her travel, and (2) "when [Alagna] did reach [Plaintiff] she was driving on the highway" when according to Plaintiff "she does not drive as a result of her fatigue and OCD."

On August 30, 2011, Alagna received and reviewed Dr. Meed's APS dated August 23, 2011. He listed fibromyalgia and UCTD as Plaintiff's primary diagnoses and diabetes mellitus and polycystic ovary as her secondary diagnoses. Dr. Meed reported that Plaintiff's subjective symptoms included diffuse fatigue, arthralgias, myalgias and neuropathy, and that Plaintiff demonstrated positive trigger points and muscle spasms. He found that Plaintiff was restricted from standing, walking and sitting for any amount of time in a general workplace environment, that she could not lift any amount of weight, reach above her shoulder, or reach at or below her waist. Dr. Meed stated that the duration of these restrictions was unknown. Alagna concluded that Dr. Meed's restrictions were "very severe and unreasonable," and requested his latest office visit notes to support his findings.

Before Hartford received Dr. Meed's response, Alagna received a letter from Dr. Hubbard, which released Plaintiff to return to work without restrictions after August 31, 2011, the date of the letter. Based on this letter, Alagna concluded that Plaintiff's primary disabling conditions were now fibromyalgia and UCTD, neither of which Hartford in the past had found to be disabling.

Then, on September 13, 2011, Hartford received Dr. Meed's office visit note dated August 23, 2011, which formed the basis of his APS of the same date. The note stated that

12

Plaintiff's fibromyalgia had not improved despite the use of a certain drug, and that Plaintiff complained of tiredness, extreme fatigue, difficulty in concentrating and inability to work in any capacity.  In the same note, but in a separate section also dated August 23, 2011, Dr. Meed stated that Plaintiff reported dramatic improvement in her symptoms related to fibromyalgia, fatigue and OCD since increasing her dosage of another drug.  Dr. Meed stated that this was the best management of Plaintiff's condition yet achieved.  Alagna concluded that Dr. Meed's office visit note, which was self-contradictory, did not support his APS' conclusion that Plaintiff was restricted from all activity.

### 2.  CIU Surveillance

Following Alagna's recommendation that Plaintiff's case be referred to CIU, CIU retained Summit Investigations Inc. ("Summit") to conduct two days of surveillance on Plaintiff.  Summit surveilled Plaintiff on August 25 and 26, 2011, and produced an Investigative Report dated August 31, 2011.  The following paragraphs recount relevant portions of Summit's surveillance.

On August 25, 2011, Plaintiff left her residence at approximately 10:52 a.m. and drove alone to a café.  She bent over at the waist to reach into her car on multiple occasions.  She searched through her purse and her car with her bare hands.  After rummaging through her purse, she entered the café and immediately put food in her mouth, again with her bare hands.  At the café, she met a man who gave her a rolled up poster.  Plaintiff shook the man's hand when he arrived.  About half an hour later, Plaintiff gathered items into a yellow plastic bag with her left hand, picked up the poster with her right hand and exited the café.  Plaintiff put the bag in the trunk of her car, and unlocked the car door with her left hand while holding the poster in her right hand.  Plaintiff then went back into the café for two minutes.  After again exiting the café,

13

Plaintiff went back to the car, picked up something with one hand and transferred it to another. Plaintiff then walked to a Staples outlet located next to the café and then went back inside the café. Subsequently, Plaintiff drove to a bank. When exiting the bank, Plaintiff was observed trotting to the car to escape the rain. Finally, Plaintiff visited a Taco Bell drive-through before returning home, two hours after she had first left. The length of recorded film over the more than two hours that Plaintiff was outside her home totaled 8 minutes and 21 seconds.

Later in the day, Plaintiff was observed exiting her car with wadded paper, a plastic bag and a spray bottle. Even later, she walked her dog briefly outside her residence.

The next day, on August 26, 2011, at approximately 10 a.m., Plaintiff opened and closed her car door using both hands and then touched her face. She later put on elastic gloves and entered the car from the driver's side with a spray bottle. After about fifteen minutes she emerged from the car and, while bending over, cleaned the back panel of the car's trunk and the roof above the passenger seat. On her way back inside, she dropped her keys and bent over to pick them up. She then returned to her car at a brisk pace and drove away. She returned home five hours later. CIU Investigative Analyst Yvonne Bretz noted that Plaintiff's driving and shaking hands "appear to be inconsistent [with] claimant's and physician's reported limitations."

CIU asked Summit to further surveil Plaintiff on September 21 and 22, 2011. On September 21, 2011, Summit observed Plaintiff walk her dog around her apartment complex for five minutes, during which she bent over the dog and removed something from the dog's eye with her bare hands. Plaintiff was not observed on September 22, 2011.

CIU Analyst Bretz verified that Plaintiff's address was the same as the one where she was observed. Based on her online searches, Bretz further determined that Plaintiff owned Pilamaya

14

LLC, d/b/a Hand and Stone Massage Spa, which she had founded in April 2010.  Plaintiff listed her ownership of Pilamaya on her Facebook and LinkedIn pages.  Bretz also located a November 1, 2010 article published in the Stamford Advocate in which Hand and Stone Massage Spa's Vice President of Franchise Development referred to Plaintiff as "a multi-unit franchisee from New York City who is moving to Connecticut."  The article stated that the licensing fee for the franchise was $39,000 and that the franchisee was required to have $40,000 in working capital in addition to $75,000 to $100,000 in liquid capital.

Approximately 10 days after the last day of surveillance, on October 3, 2011, CIU Investigator Heather Reiss attempted to set up an in-person interview with Plaintiff by calling her on the phone.  In response, Plaintiff left Reiss a voicemail giving her a time in the afternoon, and explaining that she would prefer to speak over the phone rather than meet in person because of her OCD.  When Reiss was able to reach Plaintiff on her phone on October 4, 2011, Plaintiff repeated her preference of speaking on the phone because her OCD prevented her from having people at home.  Reiss suggested meeting outside the home but insisted that Hartford required an in-person meeting.  After some back and forth, Reiss agreed to conduct a phone interview on October 18, 2011.

Before the interview, on October 11, 2011, Reiss visited Dr. Meed in an attempt to confirm that the person in the surveillance videos was indeed Plaintiff.  Dr. Meed stated he could not confirm it was Plaintiff because he saw many patients and the pictures were blurry.  Reiss then inquired why his opinion of Plaintiff's functionality contradicted the actual office visit notes of August 2011.  Dr. Meed told Reiss that he does not get paid by patients to be an objective third party, and that in any case the medical records did not demonstrate any limitations other than

lifting.  Before Reiss left Dr. Meed's office, his secretary told her that the woman in the surveillance video and photos looked like Plaintiff but she could not be sure.  Reiss' subsequent attempts to identify Plaintiff in the surveillance video and photos had similarly mixed results. The best responses were from two of Plaintiff's co-workers at TDAmeritrade, who were not a hundred percent sure the person observed was Plaintiff.

### 3.   CIU Interview

On October 18, 2011, Reiss interviewed Plaintiff.  She informed Plaintiff that she would need to come by her apartment to obtain a photo identification and updated authorizations, to which Plaintiff indicated her consent.  Plaintiff said that principally her OCD and UCTD prevented her from working, but her foot problems, low thyroid, allergies and skin conditions contributed as well.  She said that she was still being treated by Drs. Meed (rheumatologist), Hubbard (foot surgeon) and Sherman (psychiatrist).  She also stated that Dr. L. Tracey Silva would be her new primary care physician.  Plaintiff reported being on Cymbalta, and said she was treated by Dr. Sherman twice a year.  She reported that she could walk only ten to fifteen minutes before needing to rest.  Plaintiff reported that she never went to supermarkets, malls or large stores and had all her groceries delivered at home.  She said she could stand for ten minutes before feeling pain, and could complete errands taking up to an hour if she used her car.  She stated that she could lift her dog, and bend at the waist, but with pain.  She reaffirmed that she does not like to shake hands with people because of her OCD.  She reported that she washes her hands "a lot," sleeps ten to twelve hours in a day and typically wakes up around noon.  Plaintiff said she does not wash her car and "always" takes it to a car wash, that she tried to do all her

errands on one day and then inevitably crashed from exhaustion the next day, and that she could not leave the house on consecutive days.

The interview then turned to whether Plaintiff owned any businesses. Plaintiff stated she did not have a business at the present time but was planning to start one to supplement her income. When asked if she was affiliated with Pilamaya, LLC, Plaintiff said she had set it up as an investor to start her own spa business, which she hoped to open by the end of the year. She said that she would have to hire massage therapists and a manager. Plaintiff explained that there was not much work to be done as a franchise owner because the franchisor had most things already set up.

After the interview, Plaintiff left angry voicemails with Reiss telling her not to come to her house, that she would not meet with her, that she would not give her a copy of her driver's license and that she did not appreciate her questions.

### 4. *Updated Records*

A few weeks later, on November 10, 2011, Hartford Investigative Analyst Christina Wagner asked Ms. Wallace's treating physicians to provide updated medical records. On November 22, 2011, Hartford received a report from Plaintiff's board certified general physician, Dr. Ellen Blye, which stated that Plaintiff was in no acute distress and that she was alert, cooperative and had a normal attention span, mood, affect and concentration. On the same day, Hartford also received Dr. Silva's records and official visit notes that echoed Dr. Blye's analysis.

On January 10, 2012, Hartford informed Plaintiff that it would begin to reduce her LTD benefits by the amount of Social Security Disability ("SSD") benefits she could have received had she applied for SSD benefits. Plaintiff objected, and on January 20, 2012, Hartford agreed

not to offset any estimated SSD benefits if Plaintiff applied for them by February 2012.  On the same day, Plaintiff explained that she had been delayed in applying for SSD benefits because she had been very busy with her move from her apartment in New York, where she could no longer afford to live.

At the beginning of the next month on February 1, 2012, Hartford received Dr. Sherman's updated medical records, including two office visit notes -- one from March 1, 2010, finding Plaintiff's mood "anxious" and affect "appropriate" and noting that Plaintiff's OCD symptoms had increased; and the other from January 13, 2011, in which Dr. Sherman did not state whether Plaintiff was disabled, but stated that she was "doing better" and planned to continue her Cymbalta dosage.

On February 2, 2012, Hartford Analyst Wagner reviewed Plaintiff's updated records and the CIU reports and concluded that Plaintiff's activities in the surveillance "appear to be inconsistent with [her treating physician's] indicated restrictions of never being able to lift/carry any weight, reach at any level and finger/handle.  Physician indicates that [Plaintiff] is very tired and is unable to work at all" because of fatigue and difficulty concentrating.  Based on the inconsistencies in Plaintiff's file, Wagner noted that she would refer the case to a CIU Medical Case Manager.

### 5.  *Dr. Gladstein's IME*

On February 21, 2012, Hartford CIU Medical Case Manager Nurse Joanna Cobb reviewed Plaintiff's file, and found inconsistencies.  Nurse Cobb referred Plaintiff's file to an outside vendor to arrange an Independent Medical Examination ("IME"), which was scheduled with Dr. Geoffrey Gladstein, a board certified rheumatologist, for April 18, 2012, to determine

Plaintiff's functional capacity.  Nurse Cobb asked the IME doctor to answer specific questions, including whether Plaintiff had any limitations and restrictions, and if so why, and her capacity for a full time 40 hour work week.

Hartford CIU requested an outside vendor, ICS Merrill, to surveil Plaintiff around the time of her IME.  ICS Merrill conducted its surveillance on April 4 and April 18, 2012.  Plaintiff was not observed on April 4, 2012.  On April 18, Plaintiff drove into Dr. Gladstein's parking lot at 1:20 p.m. and walked into the building at 1:26 p.m. carrying a white plastic bag.  She left Dr. Gladstein's office at around 2:05 p.m. and drove home.  On her way she stopped at a drive-through Taco Bell across the road from her apartment to buy food.  She returned to her apartment at around 2:50 p.m., and was not seen for the rest of the day.

Five days after the IME, on April 23, 2012, Reiss visited Dr. Gladstein to show him the surveillance footage.  She wrote of her visit:

> I reviewed the surveillance with [Dr. Gladstein] taken 4/18/12, the day he examined the claimant for her IME.  He positively identified her as the subject of the video and stated that he did not find any objective findings to support her disability.  I then outlined the investigation explaining that the claimant initially became disabled 2/4/10 due to a nonunion of a fractured foot.  She is now claiming that she is unable to work due to fatigue and pain associated with her undifferentiated connective tissue disorder.  It was noted that two months after becoming disabled, the claimant purchased three Hand and Stone Massage Franchises and moved from New York City to Stamford to open a spa business in three locations in CT.  Dr. Gladstein was unaware of this information.  We then reviewed the surveillance done on 8/25/11 and 8/26/11 which showed the claimant to be very active on both days which contradicts herself [sic] reported limitations.  He also viewed the surveillance obtained on 9/22/11.  Dr. Gladstein positively identified the claimant as the subject of all the videos and commented on the fact that the claimant had gained a significant amount of weight, but he did not think she was totally disabled.  I gave a copy of the surveillance to the Dr along with the surveillance reports for his review. He noted that he had already dictated his report and would provide an addendum. He thanked me for stopping by and providing the additional information.

On May 8, 2011, the outside vendor Hartford had contracted to find a doctor for Plaintiff's IME informed Hartford that "[f]ollowing review of the surveillance video, Dr. Gladstein contacted us to say he was going to redictate his entire conclusion section, as it had changed nearly all of his responses to the questions in the report you requested on [the] claim."

Around the same date, Hartford received and reviewed Dr. Gladstein's IME report.  The report concluded that Plaintiff was in no acute distress.  Dr. Gladstein found that Plaintiff had fibromyalgia, a chronic pain syndrome as well as a sleep disorder, but that there was no evidence of UCTD.  He noted that at Plaintiff's last visit with Dr. Meed in April 2012, Dr. Meed stated there had been no major change in Plaintiff's symptoms in the past two years.  He also stated there had been no medical testing to support Plaintiff's claim that she had UCTD.  Based on his physical examination, Plaintiff's subjective complaints and her medical records, he could not identify any limitations that were not related to her fatigue.  Of the video surveillance, Dr. Gladstein stated that it "clearly show[ed] the patient doing numerous activities" including "actually washing and wiping down her car."  He also noted that he had been given an article from "Stamford.com" that shows Plaintiff "is in the process of operating a number of massage franchises in the Connecticut area."

In answer to Nurse Cobb's specific queries, the report stated that nothing would limit Plaintiff's ability to stand, lift or walk, and that in Dr. Gladstein's opinion, Plaintiff had demonstrated that she was functionally able to work full time for 40 hours per week.  He noted that Plaintiff had "extreme fatigue" but that the physical examination did not indicate any limitations.  Further, "based on [the] surveillance video, she is clearly capable of working in at least a sedentary occupation."

Upon review of Dr. Gladstein's report and the surveillance done on the most recent surveillance video, Nurse Cobb left a voicemail for Dr. Sherman to determine whether she had treated Plaintiff since January 13, 2011, almost 16 months earlier, and noted that Plaintiff had informed Dr. Gladstein that she continued to see Dr. Meed in New York despite claiming not to be able to travel long distances. On May 10, 2012, Hartford sent a copy of Dr. Gladstein's report to Drs. Meed and Silva for comment. Both doctors received the documents on May 15, 2012, but neither responded.

Based on a review of the entire record, Nurse Cobb concluded that Plaintiff's functional capacity exceeded her claimed limitations.

On June 8, 2012, Hartford prepared an Employability Analysis Report ("EAR") for Plaintiff to determine her current employability. Based on Plaintiff's work history, training, education and other relevant data, Hartford identified four occupations within Plaintiff's functional ability and earnings range, including manager of a brokerage office, vice president, department manager and media buyer. On June 14, 2012, the EAR was supplemented with more possible occupations.

### 6. *Initial Adverse Determination*

Plaintiff was about to exhaust the 24-month LTD benefits based on "her occupation" on August 4, 2012, when she would have to show that she was unable to perform "any occupation" to continue receiving LTD benefits. Based on a review of all the records, Wagner concluded that Plaintiff could not satisfy the "any occupation" disability under the Plan. Her supervisor concurred that Plaintiff was unable to show her eligibility for LTD benefits under the "any occupation" standard and accordingly that her LTD benefits should terminate on August 5, 2012.

21

Hartford informed Plaintiff of its decision by a letter dated July 19, 2012, from Wagner. The letter stated that the denial was based on Plaintiff's entire medical record, including surveillance video.  The letter noted that the video showed Plaintiff engaging in activities she had claimed she could not perform, including leaving the house, shaking hands, standing and walking for considerable lengths without assistance, driving long distances, bending at the waist and lifting items.  The letter also stated that Dr. Gladstein's IME report had found her functionally capable of performing a sedentary job.  Further, based on the EAR analysis, Plaintiff was not prevented from performing the essential duties of any occupation as required by the Plan. Finally, the letter provided instructions on how to appeal the decision.

### E.  Plaintiff's Appeal

On August 12, 2012, Plaintiff filed her first letter of appeal.  She challenged the bases of Hartford's denial of LTD benefits: she stated that she could not work 40 hours per week; she challenged Hartford's reliance on a twenty-minute examination of Plaintiff over the opinions of her treating physicians; and she explained that she had received no income and generated only losses from her spa, which had not actually opened until January 21, 2012.  On August 28, 2012, Plaintiff's claim was referred to Hartford's Appeal Specialist Chris Davis.

On February 22, 2013, Plaintiff filed a supplemental appeal letter raising additional challenges to Hartford's determination, including: Hartford relied on Plaintiff's purchase of a spa franchise while ignoring her claimed inability to run it effectively; the EAR disregarded her inability to meet the work styles of the positions suggested; Hartford cherrypicked the surveillance evidence to maximize her activity and ignored the days she did not leave the house; Hartford discounted her subjective symptoms of fibromyalgia and UCTD and did not seek further

review of her OCD; and Hartford improperly relied on an IME it had procured through selective information.

### 1. Letters in Support

In addition to Plaintiff's letters of appeal, she submitted, inter alia, letters from Drs. Meed and Sherman, a personal statement, letters from her friends, a notice from Hand and Stone Massage of intent to terminate her spa franchise, Pilamaya's profit and loss statements, a letter from a former spa employee and a letter from an unhappy customer at her spa.

Dr. Meed's letter dated February 1, 2013, stated that he had treated Plaintiff for UCTD and fibromyalgia since 2009, and that she continued to test positive for multiple trigger points consistent with fibromyalgia. He also found evidence of UCTD and that Plaintiff responded to her medications specifically targeting fibromyalgia. Finally, he noted Plaintiff's fatigue that prevented her from working.

Dr. Sherman stated in her February 13, 2013, letter that Plaintiff had been her patient since May 8, 2006, when she was diagnosed with OCD. She stated that Plaintiff's dosage of Cymbalta for chronic pain and OCD had not resulted in much improvement. She also recounted examining Plaintiff's hands on January 16, 2013, which Plaintiff was washing "to the point of skin redness and irritation." She wrote that Plaintiff's pain increases her OCD symptoms. She also stated that Plaintiff's OCD interfered with her work capacity because of checking rituals before leaving home and her fear of contamination that resulted in excessive washing.

Plaintiff's personal statement dated February 21, 2013, offered new facts about the surveillance video. First, she argued that the video showed that she rarely left home. Second, she explained that the man she had met in the café was an architect helping her design her spa whose

hand she shook because she "felt it was expected."  She explained how her right hand interacted

with the plans he brought and his hand, and was accordingly contaminated.  She did not touch the

contaminated right hand with the uncontaminated left hand until she could wash her hands at the

back of the café, out of sight of the surveillance camera.  Third, she explained that cleaning her

car the next day had been a decontamination ritual during which she spent most of her time

(around fourteen minutes) inside the car.  She also objected to Hartford's characterization of her

decontamination as "cleaning," which requires a hose, water and soap, and not disinfecting spray.

She stated that "this decontamination is something I do practically every time I leave my home."

In addition, she explained that she had not reported her spa business to Hartford because

she hadn't opened it when she was first asked about it, and later when it did open, it lost money.

She said that the franchisor terminated her franchise because of lack of management and

supervision and her failure to disclose her chronic medical condition which prevented her from,

in the franchisor's words, "devoting sufficient time or attention to actively manage the Spa."

Her friends, Lisa Ryder Moore and Leslie Paladin, wrote that Plaintiff used to be an

athlete, but that her health had deteriorated rapidly.  They also reported various instances of

Plaintiff's disorganization, lack of response to calls and chronic lateness.

Pilamaya LLC's profit and loss statements showed that it had less than $2,000 in revenue

in 2011, and more than $200,000 in loss in 2012.

A former employee explained in a letter that Plaintiff was frequently absent from the

franchise, that she responded only after numerous attempts on the phone, that she did not respond

to customer complaints on the spot and that, on occasion, she could not be reached to resolve an

issue until the following day.

24

After an initial review, on March 5, 2013, Davis sent Plaintiff's medical records to an independent vendor for referral to two IPC physicians, board certified in rheumatology and psychiatry respectively.  Plaintiff's records were enclosed with the caption:

> ALL MEDICAL RECORDS RECEIVED AS OF THE DATE OF THIS REFERRAL ARE ENCLOSED, INCLUDING CLAIMANT'S MOST RECENT SELF REPORTED STATEMENTS OF FUNCTIONALITY.

### 2.  *Dr. Ash*

The independent vendor retained Dr. Julia Ash, a board-certified rheumatologist, to review Plaintiff's medical records and provide an opinion on Plaintiff's functional capacity related to her reported diagnoses of fibromyalgia and UCTD.

In her report dated March 21, 2013, Dr. Ash listed all the documents that she reviewed, but did not list two of Dr. Meed's APSs, office visit notes, letter or APS of Dr. Sherman, Plaintiff's personal statement or any other letter from her friends, employee or customers.

Dr. Ash stated that she spoke to Dr. Meed who was unable to point to evidence for UCTD.  She asked him if he would agree that Plaintiff was functionally able to perform a sedentary job with breaks.  He disagreed.

Dr. Ash found that the diagnosis of UCTD was medically unsupported, in light of Dr. Meed and Dr. Gladstein's consistent normal findings during physical examination.  She also found there was inadequate evidence of connective tissue disease.  Although she noted that Dr. Meed had diagnosed Plaintiff with fibromyalgia, based on the surveillance video, she found no support for Plaintiff's claim of disabling fatigue.  During a conversation with the other IPC doctor, Dr. Melvyn Lurie, both agreed that symptoms of OCD do not cause somatization or exacerbate fibromyalgia symptoms.

25

Dr. Ash ultimately concluded that Plaintiff was functionally able to work a normal full-time 8-hour day, with some restrictions, including short breaks for stretch and resting, occasional standing and carrying up to 10 pounds and occasional bending at the waist.  Dr. Ash did not find any further limitations necessary as a result of the side effects of Plaintiff's medications.

### 3.  *Dr. Lurie*

The vendor retained Dr. Lurie, a board-certified psychiatrist, to opine on whether Plaintiff's OCD was disabling.  Dr. Lurie did not personally interview Plaintiff, but reviewed the documents sent by Hartford.  Dr. Lurie failed to list the letters from Plaintiff's friends, customers or employee and various documents from Dr. Meed among the documents he reviewed.  Dr. Lurie called Dr. Sherman to discuss Plaintiff's case on three separate occasions but did not report receiving a response.

Dr. Lurie concluded in his report dated March 21, 2013, that Plaintiff's reported symptoms such as checking, washing and fear of contamination were consistent with OCD. Based on Plaintiff's apparent comfort in public places, as demonstrated in the surveillance video, Dr. Lurie concluded that Plaintiff's OCD must be mild.  He noted that Dr. Sherman's office visit notes, which memorialized visits ten months apart, did not state that Plaintiff was totally disabled. He would expect more treatment if Plaintiff's OCD were as disabling as she claimed.

He also noted that the surveillance video showed no evidence of checking.  According to Dr. Lurie, Plaintiff's cleaning of the car was "not vigorous," and more akin to "waxing" or "polishing."  He also noted that Plaintiff did not appear to focus on the inside of the car, which someone with OCD would consider more contaminated and therefore clean more.  Dr. Lurie also

observed that contrary to Plaintiff's explanation, "it is unlikely the owner of a new business would be able just to hire a manager and not be involved actively."

Based on his review, Dr. Lurie concluded that Plaintiff needed no restrictions or limitations from a psychiatric perspective because there was no consistent, credible evidence for any psychiatric restrictions/limitations.

### 4. *Final Denial of LTD Benefits*

By letter dated March 29, 2013, Davis informed Plaintiff that Hartford had decided to uphold its initial adverse benefits determination. The letter stated that based on Hartford's review of Plaintiff's appeal, she no longer met the definition of disability starting on August 5, 2012.

### F. Defendants' Counterclaim

On September 15, 2011, Plaintiff signed an agreement that required Plaintiff to "provide a lump sum repayment to" Hartford if she received benefits greater than she should have been paid. She received retroactive SSD benefits in the base monthly amount of $2,509 as of June 1, 2012. Plaintiff also received LTD benefits from Hartford from June 1, 2012, until August 4, 2012, which all parties agree must be offset by the amount of SSD benefits she received for that period.

### G. Hartford's Review Procedures

Through the sworn affidavits of Annette Moore, Hartford's Director of Appeals, and Chris Davis, the Appeals Specialist who handled Plaintiff's appeal, Hartford submits the following information about its review procedure. Plaintiff disputes the accuracy of Moore's affidavit.

Hartford does not provide its employees tasked with making benefits determinations any incentives such as bonuses or awards for denying benefits. The appeals unit is also kept separate

27

from the claims department that handles initial claims.  Appeals Specialists do not discuss any

case with the employees who determined the initial denial of benefits.  Finally, Hartford's

financial and underwriting departments are also kept separate from and have no influence on the

claims department and appeals unit.

## II.     THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.  Standard of Review

Although the parties' motions are styled as summary judgment motions, Plaintiff's

motion is in substance an appeal from an administrative judgment.  *See, e.g.*, *Rosenberg v.

Guardian Life Ins. Co. of Am.*, No. 00 Civ. 8198, 2002 WL 31885930, at *6 (S.D.N.Y. Dec. 27,

2002).

When an ERISA benefit plan gives the administrator discretionary authority to assess a

participant's eligibility, the denial of benefits "is subject to arbitrary and capricious review and

will be overturned only if it is 'without reason, unsupported by substantial evidence or erroneous

as a matter of law.'"  *Thurber v. Aetna Life Ins. Co*., 712 F.3d 654, 658 (2d Cir. 2013) (quoting

*Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999)).  "Substantial

evidence is 'such evidence that a reasonable mind might accept as adequate to support the

conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a

preponderance.'"  *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d

Cir. 2003) (alterations in original) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072

(2d Cir. 1995)).  "[A] district court's review under the arbitrary and capricious standard is limited

to the administrative record."  *Miller*, 72 F.3d at 1071.  On a motion for summary judgment, the

arbitrary and capricious standard means that the Plan Administrator's decision should be upheld

"unless it is not grounded on *any* reasonable basis." *Wedge v. Shawmut Design & Constr. Grp. Long Term Disability Ins. Plan*, 23 F. Supp. 3d 320, 334 (S.D.N.Y. 2014) (internal citation omitted).

ERISA also requires the plan administrator to provide a "full and fair review" of any denial of a claim.  29 U.S.C. § 1133(2).  The nature of the "full and fair review" to which a plan beneficiary is entitled has been developed through regulation.  *See Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 286 (2d Cir. 2000).  In particular, the plan administrator must "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."  29 C.F.R. § 2560.503-1(h)(2)(iv).  Courts apply the "arbitrary and capricious" standard in evaluating the "full and fair review" provided by a plan administrator.  *See Crocco v. Xerox Corp.*, 137 F.3d 105, 108 (2d Cir. 1998).

Here, all parties agree that the Plan vests Hartford with discretionary authority in determining a claimant's eligibility for benefits.  The language in the Plan is unequivocal: Hartford has "full discretion and authority to determine eligibility for benefits."  Accordingly, Hartford's determinations are subject to the arbitrary and capricious standard on review.

## B.  Analysis

Plaintiff challenges (1) Hartford's initial termination of Plaintiff's LTD benefits by letter dated July 19, 2012, and (2) Hartford's decision to uphold its initial termination decision by letter dated March 29, 2013.

29

### 1. *Hartford's Initial Denial of LTD Benefits*

#### a. **Conflict of Interest**

Plaintiff argues that Hartford's discretionary decision-making must be given reduced deference because Hartford was operating under a conflict of interest. Instead, the procedural unreasonableness that tainted Hartford's initial determination will be accorded some weight in evaluating Hartford's initial determination to deny benefits, but no such analysis is required in evaluating Hartford's decision on appeal.

"[A] plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh . . . but does not make de novo review appropriate." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008). "A plaintiff's showing that the administrator's conflict of interest affected the choice of a reasonable interpretation is only one of several different considerations that judges must take into account when reviewing the lawfulness of benefit denials." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009) (internal quotation marks and alterations omitted). "[C]ourts may dial back deference if a benefit plan gives discretion to an administrator . . . who is operating under a conflict of interest." *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 485 (2d Cir. 2013) (citation and internal quotation marks omitted). However, "[n]o weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 140 (2d Cir. 2010).

Hartford argues that any conflict of interest it operates under should be given no weight because it "has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances." *Metropolitan Life*

*Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).  Plaintiff counters that Hartford relies on self-serving affidavits outside the record to establish its efforts to reduce potential bias, and therefore such evidence should not be considered.  Plaintiff's argument is rejected; Hartford has demonstrated that it had enacted sufficient procedural safeguards to prevent against bias from structural conflict.  *See, e.g.*, *Topalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 363 (E.D.N.Y. 2013) (considering the affidavits submitted by Hartford employees in finding that "Hartford has implemented the type of 'walling-off' necessary to separate claims administrators from Hartford's financial departments").

However, in *Metropolitan Life Insurance Company v. Glenn*, the Supreme Court explained that procedural unreasonableness in a claim determination -- apart from any fact of conflict of interest -- could be a factor in evaluating a plan administrator's determination on benefits.  *See* 554 U.S. at 118 (stating that a "course of events" that "suggested procedural unreasonableness" was "an important factor in its own right" in evaluating a claims administrator's denial of benefits).

At the initial determination stage, CIU Investigator Reiss presented Dr. Gladstein with a biased version of Plaintiff's claim that led him to change his ultimate conclusions.  Hartford's action, through Reiss, was at the very least procedurally unreasonable and consequential in the review of Plaintiff's claim.  Because Dr. Gladstein's altered conclusions affected Hartford's determination to deny Plaintiff LTD benefits, it is appropriate to weigh the procedural unreasonableness of Reiss' actions in evaluating Hartford's initial determination.  *See Durakovic*, 609 F.3d at 140.

31

The following sequence of events demonstrates Hartford's procedural unreasonableness regarding what was supposed to be Dr. Gladstein's "independent" evaluation: Five days after Dr. Gladstein wrote his first report diagnosing Plaintiff with fibromyalgia, chronic pain syndrome and a sleep disorder, Reiss went to him and provided him with a copy of her surveillance videos. Rather than allowing Dr. Gladstein to form his own conclusions about the video, according to her own notes of the conversation, Reiss gave Dr. Gladstein an inaccurate picture of Plaintiff's medical history.

First, she stated that Plaintiff was initially disabled by a nonunion fracture of the foot, but that "[s]he is *now* claiming that she is unable to work due to" UCTD.  (emphasis added).  Setting aside the merits of Plaintiff's UCTD claim, Hartford was aware that Plaintiff had always claimed disability because of UCTD, including in Reiss' own interview with Plaintiff.  By telling Dr. Gladstein that Plaintiff was now claiming UCTD, Reiss cast unnecessary aspersion on Plaintiff's credibility.

Second, Reiss told Dr. Gladstein that after becoming disabled, Plaintiff had "purchased three Hand and Stone Massage Franchises" and had moved from New York City to Stamford to open a spa business in the three locations in Connecticut.  Based on Dr. Gladstein's report, she also appears to have shown him the newspaper article about Plaintiff's spa franchises.  As an initial matter, the information regarding Plaintiff's franchises was irrelevant to any finding Dr. Gladstein was asked to make about Plaintiff's functionality based on his direct examination. Most important, the information provided was incorrect; Plaintiff had purchased only one franchise at the time of the conversation with Dr. Gladstein.

32

As the note from Dr. Gladstein's report makes clear, as a result of Reiss' visit, he changed his "entire conclusion section" in responding to the specific questions Hartford had asked him to answer.  Accordingly, Hartford's initial determination, which was explicitly based on the IME it improperly influenced, will be evaluated in light of this "course of events."  *Glenn*, 554 U.S. at 118.

However, no such procedural defect affected Hartford's decision on appeal.  Accordingly, the appellate decision warrants review under the "arbitrary and capricious" standard.

### b.  Analysis of the Initial Denial of LTD Benefits

Plaintiff challenges Hartford's initial denial of LTD Benefits dated July 19, 2012, on two grounds: first, that Hartford impermissibly ignored Plaintiff's psychiatric symptoms in denying her LTD benefits; and second, that Hartford improperly influenced Dr. Gladstein's IME report, which it then relied on.  Even taking into account the procedural unreasonableness exhibited by Hartford at this first stage, neither argument is persuasive.

#### i. Plaintiff's Claim of OCD

Hartford did not engage in arbitrary and capricious decision-making by not giving credence to Plaintiff's claim that her OCD was disabling.  On September 22, 2010, Hartford initially approved Plaintiff's LTD benefits based on nonunion fracture and impending surgery on her left foot, not because of her OCD.  At a later stage, on May 31, 2011, when it became clear that the foot fracture had resolved, Hartford noted that OCD might become Plaintiff's primary condition.  However, neither Plaintiff nor Dr. Sherman supplied Hartford with any medical records that showed that Plaintiff's OCD functionally incapacitated her.

Plaintiff's argument that Hartford "entirely failed to consider [her] OCD in its initial claim termination" is belied by Hartford's termination letter, which explicitly stated that Hartford considered office notes and reports from Plaintiff's psychiatrist, Dr. Sherman, which included:

- An office visit note from March 1, 2010, noting that Plaintiff's OCD symptoms had increased;

- An office note from January 13, 2011, stating that Plaintiff was "doing better";

- A February 4, 2011 APS finding that the stress of Plaintiff's foot surgery had made the OCD "disabling," but targeting a return to work date one year later on February 4, 2012.

The remaining evidence regarding Plaintiff's OCD, although not mentioned in the letter, was similarly weak: in October 2011, Plaintiff reported that she was being treated by Dr. Sherman twice a year; and in or around May 2012, Dr. Sherman did not respond to Hartford's attempt to get in touch with her.  In sum, the medical information regarding Plaintiff's OCD did not meet Plaintiff's burden of showing that her OCD was disabling.  *See Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004) (stating that "the insured has the burden of proving that a benefit is covered").

Hartford's surveillance provided further support for finding that Plaintiff's OCD claim lacked credence.  As Hartford's initial termination letter noted, contrary to Plaintiff's representation that she could not shake hands because of her OCD, the surveillance video showed her shaking hands with a man in a café.

At most Plaintiff can argue that Hartford did not explain explicitly its reasons for rejecting her OCD claim in its initial determination.  However, there was little to no medical support for

such a claim at the time of the initial determination.  Accordingly, even giving Hartford's

procedural unreasonableness some weight, Hartford acted well within its discretion in not

addressing Plaintiff's OCD claim at length.

### ii. Dr. Gladstein's IME

Plaintiff's argument that Hartford's reliance on Dr. Gladstein's report was arbitrary and

capricious is similarly unavailing.  Even stripping Dr. Gladstein's report of all reference to

Plaintiff's spa franchise for the reasons discussed above, the report is still well-supported by the

evidence.  Dr. Gladstein reviewed the following contemporaneous reports from Dr. Meed,

Plaintiff's own rheumatologist:

- An  office visit note from March 2, 2010, stating that there was no longer any evidence of UCTD and that fibromyalgia was her limiting factor;

- An APS from March 18, 2010 adding that Plaintiff was able to carry up to 10 pounds occasionally;

- An office visit note from March 19, 2010, reporting no change;

- An office visit note from  January 11, 2011, again stating that fibromyalgia was Plaintiff's limiting factor; and

- An office visit note dated August 23, 2011 stating that Plaintiff had increased her dosage of Cymbalta, resulting in a "dramatic improvement in [the] fibromyalgia" and that, "[t]his is the best management of her condition we have yet achieved."

Dr. Gladstein noted that there were no further records available from Dr. Meed.

Dr. Gladstein's physical examination uncovered no physical abnormalities. He noted, "[t]rigger point examination shows some areas of tenderness, but without a significant number of the typical trigger points usually associated with fibromyalgia."

Based on his review of Plaintiff's medical records and his physical examination, Dr. Gladstein found no basis for a UCTD diagnosis, and also stated that Plaintiff suffered from fibromyalgia, chronic pain syndrome and a sleep disorder. He further concluded that she did not appear to have any physical limitations that would interfere with her ability to stand, lift or walk, except as they related to her claims of fatigue.

Based on these facts, the open issue was the extent to which Plaintiff's fatigue interfered with her ability to work in a sedentary occupation. Dr. Gladstein had, on the one hand, Plaintiff's self-serving statements of debilitating fatigue, stiffness and an inability to sit for more than two hours or stand for longer than a few minutes. On the other hand, he had the surveillance videos showing Plaintiff engaged in "numerous activities" on consecutive days. On this record, he had a reasonable basis to conclude, contrary to Dr. Meed, that Plaintiff's fibromyalgia would not prevent her from engaging in a sedentary occupation, with frequent breaks and limitations on standing, walking, lifting and the like.

Although it was procedurally unreasonable for Reiss in essence to advocate Hartford's "no disability" position to Dr. Gladstein including factual inaccuracies, the video evidence presented to him was real and not altered or fabricated. Accordingly, Dr. Gladstein's ultimate conclusion that Plaintiff would be able to perform a full-time sedentary job was reasonable. Even considering and giving weight to Hartford's procedural unreasonableness, Plaintiff has not met her burden of showing that Hartford's initial denial of LTD benefits was improper.

36

Hartford's reliance on Dr. Gladstein's report was not unreasonable for the additional reason that its conclusion was fully consistent with the latest office notes Hartford received from Plaintiff's general physician, Dr. Silva, dated November 2, 2011, which stated that Plaintiff was in no distress and appeared well.  Further, as Hartford noted in its letter to Plaintiff, neither Dr. Meed nor Dr. Silva responded with any comments or disagreements despite receiving copies of Dr. Gladstein's report.

Plaintiff's reliance on Dr. Meed's conclusion that Plaintiff could not sit or stand as required for full-time employment is misplaced because Dr. Meed's contrary conclusions warrant reduced credibility.  When challenged about his recommendations, he even stated that he was not paid to be a neutral third party for his clients.  Dr. Meed, like Dr. Gladstein, did not report physical abnormalities as the cause of Plaintiff's limitations, but instead apparently credited Plaintiff's subjective statements.

In any case, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Here, there was reliable evidence that conflicted with Dr. Meed's diagnoses.  Accordingly, Hartford's well-considered initial termination decision was not arbitrary and capricious.

To the extent Plaintiff argues that surveillance should not have been used at all, the argument fails.  *See, e.g.*, *Ingravallo v. Hartford Life & Accident Ins. Co*., 563 F. App'x 796, 800 (2d Cir. 2014) (approving of surveillance as a mode of evaluating claimant credibility when

surveillance video is not the only basis for denial of benefits); *Alto v. Hartford Life Ins. Co*., 485

F. App'x 482, 484 (2d Cir. 2012) (considering "surveillance video demonstrating [plaintiff's] far

greater than claimed ability" in reviewing claim).

## C. The Appeal

Plaintiff also challenges Hartford's March 2013 decision to uphold its July 2012

termination of Plaintiff's LTD benefits.  Specifically, Plaintiff argues that (1) Hartford failed to

take into account Plaintiff's inability to start her business; (2) Hartford withheld evidence

regarding Plaintiff's subjective conditions from the reviewing rheumatologist, Dr. Ash; and (3)

Hartford withheld critical facts from its psychiatric reviewer, Dr. Lurie, and did not correct his

errors.  The first two arguments are rejected.  The third is persuasive.

### 1. *Inability to Start Business*

As an initial matter, Plaintiff's argument that Hartford failed to take into account her

inability to start her business is belied by the record.  Dr. Lurie explicitly refers to Plaintiff's

statement, which according to him tried to "explain away the significance of the spa."  Dr. Ash

presumably had the same records, since Hartford sent all documents to the vendor that appointed

the IPC doctors.  Accordingly, Plaintiff's argument that Hartford failed to provide the

independent doctors with information about her unsuccessful spa franchise is rejected.  Further,

Plaintiff's argument that Hartford should have considered the failure of Plaintiff's spa business

more fully would have more force if Hartford's initial denial of benefits were based solely or

significantly on Plaintiff's operation or ownership of the spa franchise, but it was not.

### 2.  *Dr. Ash*

Dr. Ash's final analysis has ample support in the record, and Hartford did not act arbitrarily or capriciously in relying on it.  As an initial matter, there was no evidence in the record to support a UCTD diagnosis.  When Dr. Ash asked Dr. Meed for such evidence, he was unable to provide any.  While "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," where, as here, Plaintiff can offer no objective evidence of UCTD and no articulable basis for such a finding, denial on that basis is neither arbitrary nor capricious.  *Black & Decker*, 528 U.S. at 834.

Further, Dr. Ash reasonably concluded based on the surveillance video that while Plaintiff's fibromyalgia and fatigue were not disabling, they might limit Plaintiff's ability to work.  Accordingly, Dr. Ash's final recommendation provides for accommodations for Plaintiff's fibromyalgia.

Therefore, Hartford's reliance on Dr. Ash's report was neither arbitrary nor capricious.

### 3.  *Dr. Lurie*

Considering the entire record, however, Hartford's reliance on Dr. Lurie's clearly erroneous and inconsistent report was arbitrary and capricious.  First, and most important, Dr. Lurie stated that Plaintiff was mostly observed cleaning the outside of the car in the surveillance video.  According to him, if Plaintiff had severe OCD, she would have spent more time cleaning the inside.  He seems to have ignored the fact that Plaintiff is seen entering the car from the passenger's side and not seen emerging with her cleaning equipment for 14 minutes.  Plaintiff's explanation, which Dr. Lurie summarily discards, indicates that she was cleaning the inside of the

car for most of the time.  In other words, Plaintiff likely behaved in the very manner Dr. Lurie said someone with severe OCD would, but he drew the opposite unsustainable conclusion.

Second, Dr. Lurie unfairly disregarded pertinent information from both Plaintiff and her treating psychiatrist, Dr. Sherman.  He apparently rejected, or overlooked, Dr. Sherman's observation that during an office visit Plaintiff's hands were "red and irritated," signaling obsessive washing behavior.  He also discredited Dr. Sherman's and Plaintiff's accounts of Plaintiff's "checking" because there was no checking shown in the surveillance video.  However, both Dr. Sherman and Plaintiff explicitly stated that the checking occurred when Plaintiff was leaving her home, rather than when she was outside her home as in the surveillance video.

Third, Dr. Lurie disregarded, or was not provided with, any of the letters from Plaintiff's friends or employee that provided accounts of her psychiatric disability.  The absence of any mention of these letters does not undermine Dr. Ash's review, which was based largely on her review of the physical examinations conducted by Drs. Meed and Gladstein.  Given Dr. Lurie's unreasonable disagreement with Dr. Sherman, however, their absence provides further support for finding that Hartford's reliance on Dr. Lurie's report was arbitrary and capricious.

Finally, while a psychiatric reviewer need not in every instance conduct an in-person examination, in light of the multiple deficiencies in Dr. Lurie's analysis, an in-person examination of Plaintiff would have been especially ameliorative.  The multiple failings of Dr. Lurie's analysis "require discount[ing] or entirely disregard[ing]" his opinions because he "had not examined the individual in question at all."  *Sheehan v. Metro. Life Ins. Co.*, 368 F. Supp. 2d 228, 254 (S.D.N.Y. 2005).

In sum, Hartford's reliance on Dr. Lurie's report in concluding that Plaintiff was not disabled by her OCD was arbitrary and capricious.  Accordingly, the case will be remanded to Hartford for a "full and fair review" limited to evaluating whether Plaintiff's OCD entitles her to LTD benefits.

## III.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE COUNTERCLAIM

Hartford seeks summary judgment on its counterclaim, which seeks to recover any overpayment arising out of a retroactive award of SSD benefits to Plaintiff.  All parties agree that Hartford is entitled to offset any SSD payments against its LTD benefits payments.  Accordingly, Hartford's motion for summary judgment on its counterclaim is granted.

However, some uncertainty remains as to the amount of the counterclaim.  In their joint Rule 56.1 statement, the parties state that the amount to be offset is $5,342, but in her reply brief, Plaintiff states that Hartford has agreed to reduce its cross-claim by $4,000.  The parties are directed to file a joint letter no later than March 30, 2015, stating the amount Hartford is entitled to on its counterclaim and the basis for that amount.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED in part.  Defendants' motion for summary judgment is similarly GRANTED in part.  No later than March 30, 2015, the parties shall file a joint letter stating the amount Hartford is entitled to recover on its counterclaim.  Once the damages related to the counterclaim are resolved, the case

will be remanded to Hartford for a new review of Plaintiff's eligibility for LTD benefits not

inconsistent with this Opinion.

The Clerk of Court is directed to close the motions at Dkt. Nos. 50 and 59.

SO ORDERED.

Dated: March 26, 2015
       New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

42